**Mildred BOLMAN, Plaintiff-Respondent,**

v.

**Darrell Dean CHAPMAN and C & C Floor Covering, Inc., Defendants-Appellants.**

**No. 13005.**

Missouri Court of Appeals, Southern District, Division One.

Feb. 8, 1984.

Motion for Rehearing or to Transfer to Supreme Court Denied Feb. 29, 1984.

Application to Transfer Denied April 16, 1984.

Bob J. Keeter, Jones, Keeter, Karchmer, Nelms, Sullivan & Kirby, Springfield, for plaintiff-respondent.

Stephen L. Shepard, Springfield, for defendants-appellants.

GREENE, Chief Judge.

Plaintiff, Mildred Bolman, formerly Mildred Chapman, sued her stepson, Darrell

Dean Chapman (Dean) and C & C Floor Covering, Inc., a Missouri corporation (C & C), in a two-count petition for amounts allegedly due Mildred from Dean and C & C because of 1) Dean's default in payments on a promissory note and the breach of a stock purchase agreement, and 2) C & C's breach of a buy-sell stock agreement. Dean counterclaimed, requesting the trial court to order Mildred, who was the surviving spouse of Olaf L. Chapman, deceased, to make a full accounting of all real and personal property possessed by Olaf at the time of his death, that the court declare Dean to be an heir of Olaf and, as such, entitled to a proportionate share of Olaf's estate.

The trial court, sitting without a jury, heard the evidence and entered judgment for Mildred and against Dean for $16,-915.89 on Count I of the petition, declaring such judgment to be a lien against stock in C & C owned by Dean, and by the corporation; entered judgment for Mildred and against C & C in the sum of $14,709.47 as of September 30, 1982 on Count II of the petition, and entered judgment for Mildred and against defendants on the counterclaim. In support of its judgment, the trial court filed a 14-page memorandum, containing findings of fact, conclusions of law, and an explanation of the grounds for its decision and the method used to determine damages. Rule 73.01(a)(2), V.A.M.R. A copy of the memorandum is attached hereto, marked as Exhibit A.

Both defendants appeal on a variety of grounds, including the claims that the judgment was against the weight of the evidence, was not within the scope of the pleadings, and was based on erroneous application of law.

We have carefully reviewed the legal file, transcript and trial court's memorandum. We find that the trial court's judg-ment is supported by substantial evidence, is not against the weight of the evidence, and was not based on any erroneous declaration or application of law. This being so, the trial court's judgment should be affirmed. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). An extended opinion would have no precedential value.

Judgment affirmed. Rule 84.16(b), V.A. M.R.

FLANIGAN, P.J., and TITUS, J., concur.

CROW, J., recused.

EXHIBIT A

COURT'S MEMORANDUM

[Rule 73.01(a)(2)]

In February, 1970, plaintiff ("Mildred") was the wife of Olaf L. Chapman ("Olaf"). At that time Olaf owned 237.5 shares of C & C Floor Covering, Inc., a Missouri corporation ("C & C"), and Mildred owned 12.5 shares.[1] There were no other sharehold-ers.

Mildred and Olaf learned that Olaf had "Lou Gehrig's disease", and within a few weeks it became evident that Olaf's illness was terminal.

Olaf had an adopted son, defendant Dar-rell Dean Chapman ("Dean"), and another son Richard Leroy Chapman ("Richard"). Mildred is neither the natural, nor adoptive, mother of Dean.[2]

Edmund C. Forehand ("Forehand"), C & C's attorney, prepared two instruments, a "stock purchase agreement"[3] and a "buy-sell agreement".[4]

On April 1, 1970, the stock purchase agreement was signed by Olaf, Mildred, Dean, and Forehand as "Trustee" for Rich-

---

**1.** ¶ 3, Stipulation of Fact filed October 13, 1981 (P.Ex. 5).

**2.** *Ibid.,* footnote 1, ¶ 18.

**3.** P.Ex. 2.

**4.** P.Ex. 1.

ard, a minor.[5] The agreement recited that Olaf owned 236.5 shares and Mildred 11.5 shares (one share less, respectively, than each actually owned). The discrepancy is evidently explained by an arrangement under which Forehand was to hold two shares in trust for Dean and Richard.[6] Record ownership of those two shares, however, had not been transferred to Forehand as of April 1, 1970.

In the stock purchase agreement Olaf and Mildred promised to sell 124 shares for $62,329.84 ($502.66 per share). Dean, and Forehand as Trustee for Richard, agreed to buy. The agreement did not say how many of Olaf's 237.5 shares, or how many of Mildred's 12.5 shares, would be included in the 124 shares Dean and Forehand were buying. Payment was to be made in monthly installments of $423.63 for 28 years [7], evidenced by a promissory note [8] to be signed by Dean, and by Forehand as Trustee for Richard, payable to the order of "Olaf L. Chapman and Mildred Chapman". Curiously, paragraph 11 of the stock purchase agreement set the closing for March 20, 1970, a date which had already passed when the agreement was signed. In fact, the closing did not occur for more than four months after the agreement was signed.

The other agreement Forehand prepared was signed April 6, 1970. That one, the "buy-sell agreement" [9], was signed by Olaf, Mildred, Dean, Forehand as Trustee for Richard, Forehand as Trustee for Dean[10], and also by C & C. The buy-sell agreement recited that Olaf and Mildred owned 49.6 per cent of the shares of C & C, and that Dean, and Forehand as Trustee for Richard and Dean, owned 50.4 per cent. These recitals were obviously based on the changes in ownership contemplated by the stock purchase agreement.[11] In the buy-sell agreement, C & C agreed to buy the shares of (a) any deceased shareholder, and (b) any living shareholder who desired to sell, at a price of $502.66 per share, subject to redetermination annually.[12]

Olaf died August 3, 1970, at age 56, still wed to Mildred.[13] His other heirs were Dean and Richard.[14]

On August 18, 1970, the stock purchase agreement was "closed" as follows:

(a) Two shares owned by Olaf were purchased by, and issued to, Forehand in trust for Dean and Richard.

(b) 62 shares owned by Olaf were purchased by, and issued to, Dean.

(c) 62 shares were purchased by, and issued to, Forehand as Trustee for Richard. Of these:

    (1) 12.5 were Mildred's, and

    (2) 49.5 were Olaf's.

(d) The $62,329.84 note (dated April 1, 1970) signed by Dean, and by Forehand as Trustee for Richard, was handed to Mildred.[15]

---

5. Richard's age on April 1, 1970, was not disclosed, nor was the nature of the trust under which Forehand acted. The trust, however, terminated October 4, 1974 (¶ 10(a), P.Ex. 5) indicating Richard became twenty-one that date. If this is correct, Richard would have been sixteen on April 1, 1970.

6. The nature of the trust under which Forehand acted as trustee for both Dean and Richard, and how it related to the trust for Richard alone, was not disclosed. It is, however, immaterial.

7. ¶ 2, P.Ex. 2.

8. Exhibit "A" attached to P.Ex. 5.

9. P.Ex. 1.

10. Footnote 6, *supra*.

11. The two shares Forehand was supposedly holding in trust, plus the 124 shares to be acquired by Dean and Forehand under the stock purchase agreement, total 126 shares, 50.4 per cent of the 250 outstanding shares of C & C.

12. ¶ 6, P.Ex. 1.

13. ¶ 7 and ¶ 8, P.Ex. 5.

14. *Ibid.*, footnote 13, ¶ 9.

15. ¶ 10(a)(4), P.Ex. 5. The record is murky as to when the note was signed. The referenced

This activity left 124 shares in Olaf's name and none in Mildred's. [Simple addition demonstrates that 126 shares changed ownership in the "closing" of the stock purchase agreement, even though the agreement called for the purchase of only 124.]

The buy-sell agreement was also "closed" August 18, 1970. The remaining 124 shares in Olaf's name were purchased by, and issued to, C & C as treasury stock. At trial, no one produced a note for the purchase of these shares. Nonetheless, Mildred promptly began receiving *two* $423.63 payments each month.[16] Catherine Savage, C & C's bookkeeper since 1960, testified the payments were made at the direction of Forehand or Gene Caffey, C & C's "accountant".

Dean, who had not previously been an officer or director of C & C, became president after Olaf died.

Olaf left a will which was delivered to the Probate Court, but never "probated".[17] All parties agree that the will cannot now be admitted to probate.[18]

Before venturing further, some observations are apt.

1. The 237.5 shares in Olaf's name when he died were his separate property[19], and the successors in interest to those shares should have been determined through administration in the Probate Court.

2. The closing of the stock purchase agreement and the buy-sell agreement after Olaf's death, resulting in change of ownership of all 237.5 shares in his name, was of doubtful validity.[20]

3. The $62,329.84 note payable to Olaf and Mildred, although dated April 1, 1970, may not have been signed until after Olaf

subparagraph of P.Ex. 5 says that on August 18, 1970, the note "was executed by the Defendant, Darrell Dean Chapman and Edmond (sic) C. Forehand". The pleadings, however, suggest otherwise. ¶ 4, Count I of Mildred's second amended petition filed December 11, 1980, alleges Dean executed the note when Olaf and Mildred were husband and wife, "thereby creating a tenancy by the entirety," and *thereafter* (emphasis added) Olaf died. Dean admits this allegation. ¶ 4, Count I, amended answer filed August 26, 1981.

16. ¶ 2 through ¶ 5, Stipulation of Facts filed April 20, 1982 (P.Ex. 4). $423.63 is the amount called for in the promissory note under the stock purchase agreement, and also in ¶ 2 of the agreement itself. $423.63 is also the amount of each of the 230 payments shown in answer 3 of defendants' answers filed January 28, 1981, to Mildred's interrogatories. However, in the stipulation filed October 13, 1981 (P.Ex. 5) the parties stipulated that the two monthly payments Mildred received were $423.68 each. See ¶ 10(c), P.Ex. 5. Catherine Savage testified the payments were $423.68 each, and the amortization schedule introduced by defendants (D.Ex. D) is based on payment of $847.36 per month (two payments of $423.68 each). The five cent discrepancy between $423.63 and $423.68 does not affect the legal issues; it is pertinent only as it affects the amount of indebtedness retired by the payments.

17. Evidently no one applied for letters testamentary. Mildred did obtain an order refusing letters of administration (D.Ex. C) on August 21, 1970. The order transferred ownership of two motor vehicles, three head of livestock and miscellaneous personal property from Olaf to her.

18. Verbal stipulation in open court May 12, 1982. ¶ 473.070, RSMo 1969.

19. Mildred testified she and Olaf were "partners" and owned everything jointly. So far as the shares of C & C are concerned, the corporate records refute her testimony. Moreover, it was stipulated that Olaf owned 237.5 shares, and Mildred owned 12.5 shares, prior to the "closing" on August 18, 1970. Footnote 1, *supra*.

20. The Court infers no sinister motive on any party's part. The events of August 18, 1970, evidently occurred under guidance of counsel. The buy-sell agreement, nonetheless, calls for purchase of the shares from the *estate* of the deceased shareholder. ¶ 3, P.Ex. 1.

died.[21] Making a note payable to a deceased person creates vexing legal issues. 11 Am.Jur.2d, Bills and Notes, § 126, *et seq.*

Evidently no one worried about any of this, and after August 18, 1970, things remained as they were for the next four years.

Around October 4, 1974, the two-share "trust" terminated. One share was delivered to Dean and the other was sold to C & C by Richard.[22] Simultaneously, Richard sold his other 62 shares to C & C[23], giving C & C 187 shares in treasury stock and leaving Dean as owner of the other 63.

As of December 31, 1974, C & C's balance sheet showed a "note payable" liability to Mildred of $102,930.92.[24]

Mildred continued receiving two $423.63 payments each month through February 11, 1980.[25] One was for the stock purchase agreement and one was for the buy-sell agreement. As of February 11, 1980, Mildred had received 230 payments.[26]

About that time, Stephen L. Shepard ("Shepard") became C & C's attorney. Shepard advised Dean to ask Mildred whether she had a note for the buy-sell agreement. When Mildred was unable to produce one, C & C, on Shepard's advice, ceased all payments. Mildred has received nothing since February 11, 1980.

With this background, the Court looks at the pleadings.

Mildred went to trial on her second amended petition.[27] In Count I she sues Dean on the note under the stock purchase agreement, claiming he owes her $52,-177.21. She seeks judgment in that amount, together with a lien on the 124 shares mentioned in that agreement. The Court is mindful that Richard, acting through Trustee Forehand, was also a maker on the note, however Mildred did not sue Richard.

In Count II Mildred sues C & C on the buy-sell agreement, claiming C & C entered into it with her and Olaf as tenants by the entirety, and that after Olaf's death C & C bought her shares and her interest in Olaf's shares. Mildred alleges the price was $62,329.84, payable in monthly installments of $423.63 and bearing interest at seven per cent per annum. She claims C & C owes her $52,530.86. She seeks judgment in that amount or, alternatively, a determination of her share as "heir of the stock" of Olaf or, as a second alternative, an order compelling C & C to execute "promissory notes as provided by said agreement".

Dean answers Count I by alleging that Mildred has received $15,786.91 more than the note calls for.[28] C & C answers Count II by denying that Mildred had any interest in Olaf's shares, and alleging that she sold no shares of her own under the buy-sell agreement, having sold all of hers under the stock purchase agreement. C & C pleads it paid Mildred under the buy-sell agreement only because of a mistaken belief that Mildred had a promissory note requiring those payments. C & C prays that all payments made under the buy-sell agreement be applied on the promissory note sued on in Count I.

Dean counterclaims against Mildred, alleging that Olaf owned 124 shares of C &

---

**21.** Footnote 15, *supra.*

**22.** ¶ 10(a)(1), P.Ex. 5.

**23.** *Ibid.,* footnote 22, ¶ 10(a)(3)(c).

**24.** P.Ex. 3.

**25.** ¶ 4, P.Ex. 4.

**26.** *Ibid.,* footnote 25.

**27.** Mildred's second amended petition was filed December 11, 1980. The prayer of Count II was amended pursuant to leave granted April 20, 1982.

**28.** Dean's amended answer was filed August 26, 1981.

C when he died, plus other property.[29] Dean says he received nothing from Olaf's estate.[30] Dean prays that Mildred be ordered to account for Olaf's property and that the Court declare Dean's interest in Olaf's estate.[31]

At trial, defendants conceded that the note for the stock purchase agreement was owned by Olaf and Mildred as tenants by the entirety, and became Mildred's alone when Olaf died.[32] Defendants assert, however, that Mildred was entitled to nothing under the buy-sell agreement, and that all payments she received thereunder should be applied to the note under the stock purchase agreement. Defendants contend that by so applying them, Mildred has been overpaid.[33]

Analysis of the complex issues raised by these facts and pleadings is made easier by keeping in mind:

1. The only dispute in Mildred's claim against Dean (Count I) is whether the $62,-329.84 note has been paid. The note's validity is not challenged. Whether it has been paid depends on the Court's ruling on Mildred's claim against C & C (Count II). If the Court rules that C & C became obligated on August 18, 1970, to pay Mildred $62,329.84 in monthly installments of $423.63 under the buy-sell agreement, it follows that Mildred has not been paid the amount due her by Dean on the promissory note, and likewise has not been paid her due by C & C under the buy-sell agreement. If, however, the Court rules that C & C has no obligation to Mildred under the buy-sell agreement (and never did), and if the Court further rules that all sums paid Mildred under the buy-sell agreement are to be credited against Dean's obligation to Mildred on the promissory note, then Mildred has received more than the note calls for, and is entitled to no award here.

2. It is too late now for Dean to claim an interest in any of the items awarded Mildred by the order refusing letters of administration issued August 21, 1970, by the Probate Court of Greene County, Missouri.[34] § 473.070 and § 473.090, RSMo 1969.

3. Although Dean contends that the $10,000.00 "life insurance money" Mildred received upon Olaf's death should have gone into Olaf's "estate"[35], there is no evidence to support the argument. Indeed, the opposite conclusion is compelled. If the beneficiary of the insurance policy had been Olaf's estate, an executor or administrator would have had to be appointed to receive the proceeds. The fact that the proceeds were paid to Mildred clearly indicates that she, rather than Olaf's "estate", was the named beneficiary.

4. The only other property Dean contends should be included in Olaf's "estate"

---

**29.** Dean's counterclaim was filed January 28, 1981. The 124 shares referred to in the counterclaim are those transferred August 18, 1970, under the buy-sell agreement.

**30.** Dean testified he got Olaf's watch, pocketknife and twenty-three cents.

**31.** § 473.663, RSMo 1978.

**32.** Opening statement of defendants' attorney May 12, 1982. This concession was also made in the pleadings. See ¶ 4 and ¶ 5, Count I, second amended petition filed December 11, 1980, and ¶ 4 and ¶ 5, amended answer to Count I filed August 26, 1981. Legal academicians might balk because (a) the note does not describe Olaf and Mildred as husband and wife, or otherwise contain "entireties" language, (b) 113.5 of the shares transferred under the stock purchase agreement belonged to Olaf and only 12.5 belonged to Mildred, and there were no "entireties" shares, and (c) Olaf may have been dead when the note was signed. See footnote 15, *supra*. The Court, however, accepts defendants' concession and proceeds on the premise that the note was entireties property which became solely Mildred's when Olaf died.

**33.** Opening statement of defendants' attorney May 12, 1982.

**34.** The personal property in that order is itemized in footnote 17, *supra*. No shares of C & C were included.

**35.** ¶ 8(b), page 3, defendants' Proposed Findings of Fact filed August 13, 1982.

is the 124 shares of C & C transferred August 18, 1970, under the buy-sell agreement.[36]

The dispute thus narrows to the 124 shares transferred from Olaf's name to C & C as treasury stock August 18, 1970, under the buy-sell agreement. Does C & C owe Mildred the unpaid balance of an original $62,329.84 obligation for those 124 shares? If not, what should be done about them?

In pondering this question, the Court notes that C & C has been the record owner of those shares for more than twelve years. 115 payments of $423.63 have been made for their purchase. Additionally, Dean was of lawful age when the "closing" occurred. His counterclaim was not filed until January 28, 1981, more than ten years after the closing. It appears to the Court that if Dean had a claim against Mildred because of the transfer of those 124 shares to C & C August 18, 1970, the statute of limitations would have run prior to January 28, 1981, regardless of whether the limitation was ten years [37], five years [38], or two years.[39]

There is no evidence of any fraud or misrepresentation by Mildred, or anyone acting for her, which would extend the limitation. Indeed, Dean solemnly admitted in his 1975 dissolution action with his then-wife Sharron, that when Olaf became ill in 1970, discussions took place to determine a way in which support could be provided Mildred for the rest of her life "so that the corporation and myself could take as many deductions as possible on corporate and individual tax returns."[40] According to Dean, the intent was to provide Mildred an income of approximately $1,000.00 per month for her life expectancy of 28 years.[41] Part of this income would be generated by C & C purchasing 124 shares from Mildred and Olaf for $62,329.84, payable in monthly installments of $423.63.[42] According to Dean, C & C was to issue its note to Mildred and Olaf in that amount, the interest rate being seven per cent per annum.[43]

From this evidence, the Court finds that prior to Olaf's death, it was the intent of Olaf, Mildred and Dean that the transfer of ownership of the shares of C & C be carried out in such a way that (a) Mildred would receive a monthly income of approximately $1,000.00 for 28 years, (b) ownership and control of C & C through the outstanding, non-treasury, shares would pass to Dean and Richard (with Richard acting through Trustee Forehand until majority) and (c) maximum tax advantage would be allowed Dean and C & C.

Forehand, C & C's attorney, designed the plan, which included the stock purchase agreement and the buy-sell agreement. Things would probably have turned out as intended—and without litigation—except for:

(a) the fact that the 250 shares of C & C which were outstanding in April of 1970 were not registered to Olaf and Mildred as husband and wife, but rather were registered to Olaf and Mildred individually, in the respective amounts of 237.5 and 12.5, and

(b) Mildred's inability in 1980 to produce a promissory note made by C & C for payment of $62,329.84 in monthly installments of $423.63.

A nimble legal mind, with benefit of hindsight in 1982, can, with scant effort,

36. *Ibid.,* footnote 35, ¶ 8(a).

37. § 516.110, RSMo 1969.

38. § 516.120, RSMo 1969.

39. § 516.140, RSMo 1969.

40. Answer 11, Dean's answers to interrogatories filed May 15, 1975, in case number 75196–3.

41. *Ibid.,* footnote 40.

42. *Ibid.,* footnote 40.

43. *Ibid.,* footnote 40.

conceive better ways to have handled matters in 1970. No purpose is served, however, by dwelling on what could, or should, have been done. It is an unassailable fact that for nine and a half years after Olaf died, things went forward as the parties to this suit expected and intended. The Court thus faces the tough question of whether, at this late date, C & C should be allowed to renege on the payments which, at the time of Olaf's death, everyone understood Mildred was to receive.

As is often the case, one of the hardest tasks is identifying the proper rules of law to apply. Industrious counsel have provided sundry choices.

It seems to the Court that what we have, as between Mildred and C & C, is an unwritten promise by C & C to pay Mildred $62,329.84 in monthly installments of $423.63, the principal to bear interest at seven per cent per annum, for the 124 shares of Olaf's stock transferred to C & C August 18, 1970, under the buy-sell agreement. C & C's promise is "unwritten" because neither the buy-sell agreement, nor any other writing, contains that promise by C & C to Mildred. The fact, however, that payments were made by C & C for nine and a half years is compelling evidence that C & C recognized this obligation—note or not. The fact that the 124 shares were not registered in Mildred's name is, in the Court's view, immaterial in light of what has occurred since Olaf's death.

The Court observes that when Olaf died there were only three persons who had interests as potential distributees of his intestate property: Mildred, Dean and Richard. § 474.010, RSMo 1969.[44]

Dean, with full knowledge of what occurred at the "closing" on August 18, 1970, allowed matters to unfold as they did for nine and a half years thereafter, with no attempt to change anything. Richard, after attaining majority, sold all his shares to C & C and, to this day, makes no claim to the disputed 124 shares. Mildred, of course, claims no interest in those shares now, seeking only the monthly installments of $423.63.

Thus, even though the buy-sell agreement did not provide for things to be handled as they were, and even though the disputed 124 shares were not registered to Mildred, either singularly or jointly with Olaf, the Court does not believe it should, in 1982, undo what has gone on since August 18, 1970. Regardless of what was contained in the buy-sell agreement, the three individuals with distributee interests in Olaf's intestate property proceeded for nine and a half years carrying out arrangements they all understood. C & C acquired the 124 shares and Mildred received monthly installments of $423.63 for those shares until February, 1980. Richard, after attaining majority, sold his shares to C & C and went his separate way. Tax considerations were obviously important, and Dean and C & C have presumably taken advantage of the benefits under Forehand's plan.

Thus, as between C & C and Mildred, we have a relinquishment by Mildred, in favor of C & C, of her interest [45] in the 124 shares, and an obligation by C & C to pay Mildred $62,329.84 in monthly installments of $423.63, the principal bearing interest at seven per cent per annum.[46]

The fact that C & C's obligation is unwritten does not render it unenforceable

---

**44.** Defendants, in their after-trial suggestions, cite "RSMo 474.010(1)(d)". Subsection "(d)" of paragraph "(1)" of section 474.010 had not been enacted at the time of Olaf's death.

**45.** Mildred, as Olaf's surviving spouse, would have been entitled to half his intestate property as her distributive share. § 474.010(1)(a), RSMo 1969. Additionally, Mildred would have been entitled to a reasonable allowance out of Olaf's "estate" for her maintenance for one year after Olaf's death. § 474.260, RSMo 1969.

**46.** The note under the stock purchase agreement provides for interest at seven per cent per annum. Additionally, seven per cent per annum is the rate provided in ¶ 4 of the buy-sell agreement and Dean admitted in his dissolution action that the interest rate was to be seven per cent. See page 9, this memorandum. Both monthly payments Mildred received were $423.63. The Court is persuaded it was the intent of Mildred and C & C that C & C's debt to

under the facts here.[47] Mildred did all she was obliged to do by acquiescing in C & C's acquisition of the 124 shares and making no claim to them as Olaf's surviving spouse. Under Missouri law, detriment to a promisee or benefit to a promisor is sufficient consideration to support a contract. *Wells v. Hartford Accident and Indemnity Co.*, 459 S.W.2d 253 at 260[10–12], (Mo. 1970). Mildred's forbearance was clearly a detriment to her, and C & C's acquisition was unquestionably a benefit to it. C & C's promise was, therefore, supported by sufficient consideration. The Statute of Frauds does not apply if there has been full performance by one of the parties. *Scott v. Potter Plumbing and Heating, Inc.*, 596 S.W.2d 492 at 495[5–7], (Mo.App. 1980). Mildred, of course, has fully performed. C & C's obligation is, accordingly, enforceable even though unwritten.

C & C's contention that its payments to Mildred were made only because of a mistaken belief that she had a promissory note is not persuasive. A note is merely evidence of a debt and is not itself the debt. *Scott v. Potter Plumbing and Heating, Inc., supra*, 596 S.W.2d at 495[4]. Under the evidence here the Court finds C & C's debt exists independently.

With respect to Dean's counterclaim, the Court has earlier observed that it is apparently barred by the statute of limitations.[48] Additionally, since October 4, 1974, Dean has carried on business as owner of all outstanding shares of C & C. If the Court, at this late date, nullified the transfer of the 124 shares to C & C under the buy-sell agreement on August 18, 1970, bewildering issues would arise with respect to rights to past dividends, if any, since Olaf's death, the legality of C & C's corporate elections and acts since Olaf's death, and deductions claimed on past tax returns by Dean and C & C. Furthermore, Richard would have an interest in the 124 shares if the Court ruled they should be treated as property of Olaf's "estate". None of the parties sought to add Richard as a party to this suit. All of these factors persuade the Court that Dean's counterclaim should be denied.

The Court believes this memorandum covers all of the legal and factual issues. Defendants raised an issue about the application of the "Dead Man's Statute", § 491.-010, RSMo 1978, to certain evidence, however none of the evidence relied on by the Court in this memorandum was subject to that objection.

At trial, Mildred filed a request for findings of fact and conclusions of law, together with suggested findings of fact and conclusions of law. Mildred did not, however, specify any controverted fact issues for the Court to resolve. Rule 73.01(a)(2). Defendants filed a request for findings of fact and conclusions of law on certain specified issues. The Court believes this memorandum responds to all of those issues, though perhaps not in the precise language or sequence in which defendants submitted them. If there are any fact issues on which defendants request further findings, defendants may identify them and the Court will make any necessary additional findings.

This brings the Court to the matter of what relief to award.

### Mildred's Count I

The Court believes Mildred is entitled to judgment against Dean in the aggregate amount of the delinquent installments as of the date of judgment, together with interest on each delinquent installment at nine per cent per annum from the date it became due. § 408.040, RSMo 1978, as amended 1979. The Court does not believe Mildred is entitled to accelerate the note

---

Mildred bear interest at seven per cent per annum.

**47.** C & C pleaded the Statute of Frauds, § 432.-010, RSMo 1978, as an affirmative defense. See

¶ 16, amended answer to Count II filed August 26, 1981.

**48.** Page 8, this memorandum.

and demand payment instanter of all future installments, even though the note contains an acceleration clause. The Court is convinced that Dean, in good faith and on counsel's advice, ceased paying Mildred because Dean believed the payments by C & C under the buy-sell agreement should have been applied to the note and that, by so applying them, the note had been fully paid. The Court does believe, however, that Mildred is entitled to a reasonable attorney fee. Before determining the amount of the attorney fee, the Court wants to see counsels' figures with respect to the amount due Mildred on the note, computed in accordance with the directions above.

Mildred also seeks a lien on the 124 shares covered by the stock purchase agreement. Such a lien is authorized by paragraph 10 of that agreement. The Court will confer with counsel about the particulars of the lien.

### Mildred's Count II

The Court believes the correct relief is to declare that on August 18, 1970, C & C became obligated to pay Mildred $62,329.84 in monthly installments of $423.63, the principal to bear interest at seven per cent per annum. Such relief appears authorized by Rule 87.02(d), even though not requested in the prayer. In addition, Mildred should have judgment against C & C in the aggregate amount of the delinquent installments as of the date of judgment, together with interest on each delinquent installment at nine per cent per annum from the date it became due. § 408.040, RSMo 1978, as amended 1979. Because C & C's debt to Mildred is not evidenced by a promissory note, there is no basis to accelerate future installments, nor is there any basis for awarding attorney fees. There is likewise no basis to impress a lien on the shares.

### Dean's Counterclaim

Judgment should be entered in favor of Mildred and against Dean.

### Costs

Costs should be taxed half against Dean and half against C & C.

\* \* \*

This case has been under submission since defendants filed their suggested findings of fact, conclusions of law and argument on August 13, 1982. This memorandum is filed September 17, 1982. After counsel have made the computations for Counts I and II, counsel should contact the Court and a conference will be scheduled to go over the details which should appear in the judgment.

/s/John C. Crow  
John C. Crow  
Circuit Judge